Slip Op. 20–179

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
:
BIO-LAB, INC., CLEARON CORP., and :
OCCIDENTAL CHEMICAL CORP., :
:
Plaintiffs, :
:                      Before: Richard K. Eaton, Judge
v. :
:                      Court No. 19-00158
UNITED STATES, :
:
Defendant, :
:
and :
:
JUANCHENG KANGTAI CHEMICAL CO., :
LTD. and HEZE HUAYI CHEMICAL CO., LTD., :
:
Defendant-Intervenors. :
———————————————————————:

**OPINION**

[United States Department of Commerce's Final Results are sustained.]

Dated:  December 18, 2020

*James R. Cannon, Jr.* and *Ulrika K. Swanson*, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Plaintiffs.

*Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia McCarthy*, Assistant Director. Of counsel on the brief was *Daniel J. Calhoun*, Assistant Chief Counsel, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Gregory S. Menegaz* and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, argued for Defendant-Intervenors. With them on the brief was *J. Kevin Horgan*.

Eaton, Judge: Bio-Lab, Inc., Clearon Corp., and Occidental Chemical Corp. ("Plaintiffs")

are U.S. domestic producers of chlorinated isocyanurates[1] and the petitioners in this proceeding.

They challenge the United States Department of Commerce's ("Commerce" or the "Department")

final results published in *Chlorinated Isocyanurates From the People's Republic of China*, 84 Fed.

Reg. 37,627 (Dep't Commerce Aug. 1, 2019) ("Final Results"), and the accompanying Issues and

Decision Mem. (July 12, 2019), P.R. 74 ("Final IDM"); *see also Chlorinated Isocyanurates From*

*the People's Rep. of China*, 79 Fed. Reg. 67,424 (Dep't Commerce Nov. 13, 2014) ("Order").

In the Final Results, Commerce determined that Defendant-Intervenors and mandatory

respondents Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and Heze Huayi Chemical Co.,

Ltd. ("Heze"), Chinese producers and exporters of the chemicals, received countervailable

subsidies during the period of review, including through a loan program called the Export Buyer's

Credit Program.[2] It made this determination on the basis of adverse inferences, having found that

the use of adverse facts available ("AFA")[3] was warranted because the Government of China

---

[1]     Chlorinated isocyanurates, the subject chemicals, are "derivatives of cyanuric acid, described as chlorinated s-triazine triones" that are used for, among other things, water treatment. *See* Final IDM at 3; *Chlorinated Isocyanurates from the People's Rep. of China*, 79 Fed. Reg. 67,424 (Dep't Commerce Nov. 13, 2014) (countervailing duty order).

[2]     The Export Buyer's Credit Program provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies in order to promote exports. *See Clearon Corp. v. United States*, No. 17-00171, 2020 WL 5981373, at *1 n.5 (CIT Oct. 8, 2020). The program has been the subject of several opinions by this Court. *See, e.g., id.* at *9 nn.10-12 (collecting cases).

[3]     Before Commerce may use AFA, it must make two separate findings. First, Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested," or "significantly impedes" a proceeding. 19 U.S.C. § 1677e(a)(1), (2)(B), (C). Second, if Commerce determines that the use of facts available is warranted, it must make the requisite additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

("China") (1) failed to provide necessary information about the operation of the Export Buyer's Credit Program, and (2) failed to act to the best of its ability to cooperate with Commerce's requests for information about the program. *See* 19 U.S.C. § 1677e(a), (b) (2012); Final IDM at 5-6.

It is worth noting that, while the Department found that the respondents benefitted from the Export Buyer's Credit Program, based on AFA, the only evidence on the record regarding its use is that the respondents' U.S. customers did not use the program. *See* Kangtai's Sec. III Quest. Resp. – Part II (Apr. 2, 2018), C.R. 10-12, Ex. 15; Heze's Sec. III Quest. Resp. – Part II (Apr. 2, 2018), C.R. 3-7, Ex. 13.

To determine an AFA rate for the Export Buyer's Credit Program, Commerce used a hierarchy it developed for administrative reviews. *See* 19 U.S.C. § 1677e(d).[4] Applying step two of the hierarchy, the Department selected the rate of 0.87 percent *ad valorem* as a component of the final subsidy rate calculated for Kangtai and Heze. *See* Final IDM at 31. This 0.87 percent rate had previously been determined in an earlier segment of the same proceeding for a Chinese government loan program called the Export Seller's Credit Program. Commerce found the Export Seller's Credit Program to be "similar" to the Export Buyer's Credit Program because each conferred a similar benefit: access to government-subsidized loans. *See* Final IDM at 31; *see also*

---

information" before it may use an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1)(A).

[4]     In pertinent part, this subsection provides that if Commerce "uses an inference that is adverse to the interests of a party under [19 U.S.C. § 1677e(b)(1)(A)] in selecting among the facts otherwise available," Commerce "may . . . in the case of a countervailing duty proceeding . . . (i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use." 19 U.S.C. § 1677e(d)(1).

19 U.S.C. § 1677e(d)(1)(A)(i) (emphasis added) (permitting Commerce to "use a countervailable subsidy rate applied for the same or *similar program* in a countervailing duty proceeding involving the same country").

As in their challenges to prior reviews of the Order,[5] here, Plaintiffs do not question Commerce's finding that the use of AFA was warranted. Nor do Plaintiffs dispute the lawfulness of the hierarchy that Commerce used to select an AFA rate for the Export Buyer's Credit Program. Rather, they argue that the hierarchy, as applied here, resulted in a rate for the program that is "simply too low to induce" China to cooperate with Commerce's requests for information in the future. *See* Pls.' Reply Br. Supp. Mot. J. Admin. R., ECF No. 34, 6 ("Pls.' Reply"). Thus, for Plaintiffs, the rate fails to satisfy the purpose of the AFA statute and, therefore, is contrary to law. *See* Pls.' Mem. Supp. Mot. J. Admin. R., ECF No. 25-1, 3 ("Pls.' Br."); *see also* 19 U.S.C. § 1677e(b).

In addition, Plaintiffs claim that substantial record evidence does not support the finding that the Export Buyer's Credit Program and the Export Seller's Credit Program are "similar." *See* Pls.' Br. 4. Therefore, they ask the court to "remand [this case] to [Commerce] with instructions to reconsider [these] issues and address specifically the rationale for relying on a 0.87 percent subsidy rate rather than a higher rate and the reasons for finding that Export Buyer's Credits and Export Seller's Credits are 'similar' for purposes of applying adverse inferences pursuant to the statute." Pls.' Br. 21.

---

[5]     As Plaintiffs acknowledge in their brief, the issue raised in this lawsuit was also raised in *Bio-Lab, Inc. v. United States*, Court No. 18-00155 and *Clearon Corp. v. United States*, Consol. Court No. 17-00171. *See* Pls.' Mem. Supp. Mot. J. Admin. R., ECF No. 25-1, 1 n.1. The court notes that not only are the issues the same, but most of the arguments that the plaintiff companies made in support of their motion for judgment on the agency record in *Bio-Lab, Inc. v. United States*, Court No. 18-00155, are presented here again, nearly verbatim.

Defendant the United States ("Defendant"), on behalf of Commerce, and Defendant-Intervenors Kangtai and Heze ask the court to sustain the Final Results. *See* Def.'s Resp. Pls.' Mot. J. Agency R., ECF No. 32 ("Def.'s Br."); *see also* Def.-Ints.' Resp., ECF No. 33.

Jurisdiction is found under 28 U.S.C. § 1581(c) (2012). As this Court held on a similar record in *Bio-Lab, Inc. v. United States*, 44 CIT __, 435 F. Supp. 3d 1361 (2020), because Commerce's selection of 0.87 percent as the AFA rate for the Export Buyer's Credit Program is supported by substantial evidence and otherwise in accordance with law, the Final Results are sustained.

## BACKGROUND

### I.     The Administrative Review

In January 2018, at the request of Plaintiffs and Defendant-Intervenors, the Department commenced the third administrative review of the Order. *See Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 83 Fed. Reg. 1329 (Dep't Commerce Jan. 11, 2018). The period of review was January 1, 2016, through December 31, 2016. *See* Final IDM at 1. As in the second administrative review, Kangtai and Heze, Chinese producers and exporters of the subject chemicals, were selected as the mandatory respondents.

Between February and October 2018, Commerce sent questionnaires to China,[6] as well as to Kangtai and Heze. The Department asked China to provide information about, among other things, the operation of the Export Buyer's Credit Program—a government loan program administered by the state-owned China Export Import Bank. From Kangtai and Heze, the

---

[6]     To send questionnaires to China, Commerce transmits them to the Embassy of the People's Republic of China, in Washington, DC. It did so here, addressing the questionnaire to the attention of the First Secretary in the Economic and Commercial Office. *See* Countervailing Duty Quest. for Third Admin. Rev. (Feb. 15, 2018), P.R. 8.

Department sought information about their U.S. customers' use of the program during the period of review. *See* Countervailing Duty Quest. for Third Admin. Rev. (Feb. 15, 2018), P.R. 8.

Between April and November 2018, Commerce received timely responses to its questionnaires. Kangtai and Heze provided the information that Commerce asked for, including evidence that their U.S. customers did not obtain financing through the Export Buyer's Credit Program. *See* Kangtai's Sec. III Quest. Resp. – Part II at 14-15; Heze's Sec. III Quest. Resp. – Part II at 14-16. Consistent with its responses to questionnaires issued in the second administrative review, however, China responded that some of the information that the Department sought about the operation of the Export Buyer's Credit Program was "not applicable," because the mandatory respondents' U.S. customers did not use the program. *See* China's Initial Quest. Resp. (Apr. 5, 2018), P.R. 25-28 at 24. In addition, China asserted that it was "unable" to provide the requested information, not because it did not have it, but because, in its view, the information was "not necessary" to Commerce's determination. *See* China's Initial Quest. Resp. at 25.

## II.    Preliminary Results

On December 7, 2018, the preliminary results of the administrative review were published. *See Chlorinated Isocyanurates From the People's Rep. of China*, 83 Fed. Reg. 63,159 (Dep't Commerce Dec. 7, 2018) ("Preliminary Results"), and accompanying Preliminary Decision Mem. (Nov. 30, 2018), P.R. 53 ("Prelim. Dec. Mem."). Commerce preliminarily determined that China failed to cooperate with its requests for information. In particular, Commerce found that China's questionnaire responses failed to provide necessary information regarding, *inter alia*: (1) whether the China Export Import Bank uses third-party banks to disburse or settle Export Buyer's Credits, (2) the interest rates it used during the period of review, and (3) whether, after the program was

amended in 2013, the China Export Import Bank limited the provision of Export Buyer's Credits to business contracts exceeding $2 million. *See* Prelim. Dec. Mem. at 11-12. Finding that it could not fully analyze the operation of the program without this information, the Department concluded that necessary information was missing from the record, and that the use of facts available was warranted. *See* 19 U.S.C. § 1677e(a).

Commerce also found that China had failed to act to the best of its ability to cooperate with its information requests, and used the adverse inference that, during the period of review, Kangtai and Heze received a countervailable benefit under the Export Buyer's Credit Program. *See* Prelim. Dec. Mem. at 12; *see also* 19 U.S.C. § 1677e(b).

Having found that Kangtai and Heze used and benefitted[7] from the Export Buyer's Credit Program, Commerce determined an AFA rate for the program using a hierarchical approach. *See* 19 U.S.C. § 1677e(d); *see also* Final IDM at 30-31. The selected rate—0.87 percent—was included in Commerce's calculation of preliminary individual countervailable subsidy rates for Kangtai and Heze. *See* Preliminary Results, 83 Fed. Reg. at 63,160.

## III.    Final Results

On July 12, 2019, Commerce issued its Final IDM and found, as it had in the Preliminary Results, that Kangtai and Heze received countervailable subsidies at 0.87 percent *ad valorem* under

---

[7]      Under Commerce's regulations "[i]n the case of a loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market." 19 C.F.R. § 351.505(a)(1) (2018).

the Export Buyer's Credit Program.[8] *See* Final IDM at 27 ("As AFA, we determine that [the Export Buyer's Credit Program] provides a financial contribution, is specific, and provides a benefit to the company respondents within the meaning of [the statute]."). Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.54 percent and 1.71 percent, respectively. *See* Final Results, 84 Fed. Reg. at 37,628. Complaining that these final rates were too low to induce China to cooperate with Commerce's requests for information, and questioning whether the Export Buyer's Credit Program and the Export Seller's Program were "similar," Plaintiffs commenced this action.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

### I.   Commerce's Authority to Impose Countervailing Duties

If Commerce determines that a foreign government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," a duty will be imposed in an amount equal to the net countervailable subsidy. 19 U.S.C. § 1671(a). This "remedial measure . . . provides relief to domestic manufacturers by imposing

---

[8]      Commerce calculates "an *ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product or products to which [it] attributes the subsidy . . . ." 19 C.F.R. § 351.525(a).

duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citation omitted). The countervailing duty statute applies equally when the imported merchandise is from a nonmarket economy country.[9] *See* 19 U.S.C. § 1671(f)(1); *see also TMK IPSCO v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1306, 1313 (2017).

In its countervailability determinations, Commerce must assess the nature of a foreign government's alleged financial contribution. *See* 19 U.S.C. § 1677(5). Thus, "Commerce often requires information from the foreign government allegedly providing the subsidy." *Fine Furniture*, 748 F.3d at 1369-70 (citation omitted). This is because "normally, [foreign] governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Id.* at 1370 (citation omitted). For the same reason, "Commerce sometimes requires information from a foreign government to determine whether a particular respondent received a benefit from an alleged subsidy." *Id.*

## II.    Commerce's Authority to Use Adverse Inferences

Because Commerce lacks the power to subpoena documents and information, the law authorizes it to use an adverse inference to induce cooperation with its requests for information. *See* 19 U.S.C. § 1677e(b); *see also BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016)).

---

[9]      A "nonmarket economy country," such as China, is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

If adequate information is not forthcoming, Commerce may, under the right circumstances, apply an adverse inference. First, there must be a gap in the factual record. *See* 19 U.S.C. § 1677e(a). Thus, if a party to a proceeding fails to provide, in a timely fashion, information that Commerce has asked for, then "Commerce shall fill in the gaps with 'facts otherwise available.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(a)).

Second, there must be a finding that an interested party has failed to cooperate to "the best of its ability" with Commerce's request for information. *See* 19 U.S.C. § 1677e(b). "[I]f Commerce determines that an interested party has 'failed to cooperate by not acting to the best of its ability to comply' with a request for information, it may use an adverse inference in selecting a rate from these facts," pursuant to 19 U.S.C. § 1677e(b).[10] *BMW*, 926 F.3d at 1295 (citation omitted).

The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("*De Cecco*"). While Commerce may use adverse inferences to encourage future cooperation, it may not use AFA to punish respondents. *Id.* (citation omitted) ("[T]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.").

A foreign government may be found to be an uncooperative party. AFA, then, may be applied to an otherwise cooperative respondent to induce, or encourage, a foreign government's cooperation. *See Fine Furniture*, 748 F.3d at 1371 ("[O]n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government, fails to

---

[10]     When using adverse inferences, Commerce may rely upon information derived from the petition, a final determination, any previous review or determination, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2)(A)-(D).

provide requested information."). That is, where a foreign government is uncooperative, respondent companies from that country may face an AFA rate, even if they themselves are cooperative. The rationale for permitting the application of AFA to cooperative respondents is that "a remedy that collaterally reaches [a cooperative respondent] has the potential to encourage the [foreign government] to cooperate so as not to hurt its overall industry." *Id.* at 1373. Though Commerce's use of adverse inferences may adversely impact a cooperating party, Commerce must take into consideration a respondent's status as a cooperating party and the statute's primary purpose of determining accurate rates when assigning an AFA rate. *See Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014). Indeed, the cases indicate that, where a nonmarket economy respondent is cooperative, but the government of its country is not, the court should lean toward accuracy and away from deterrence. *See Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2018 WL 6271653, at *5 (CIT Nov. 30, 2018) ("*Changzhou I*") (citing *Mueller*, 753 F.3d at 1234).

## III.   Commerce's Use of a Hierarchy to Determine an AFA Countervailable Subsidy Rate

The adverse inferences statute, § 1677e, was amended in 2015 by the Trade Preferences Extension Act to add subsection (d). *See* Trade Preferences Extension Act of 2015 § 502, Pub. L. No. 114-27, 129 Stat. 362 (June 29, 2015) (codified in 19 U.S.C. § 1677e(d) (Supp. III 2015)). Subsection (d) addresses subsidy rates in AFA determinations. In pertinent part, this subsection provides that if Commerce "uses an inference that is adverse to the interests of a party under [19 U.S.C. § 1677e(b)(1)(A)] in selecting among the facts otherwise available," it may "in the case of a countervailing duty proceeding":

> (i)  use a countervailable subsidy rate applied for the *same or similar program* in a
> countervailing duty proceeding involving the same country; or

> (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use.

19 U.S.C. § 1677e(d)(1)(A) (emphasis added). For administrative reviews, Commerce has employed a four-step hierarchical method[11] in an effort to satisfy the statute's "same or similar program" injunction:

> The AFA hierarchy for reviews has four steps, applied in sequential order. The first step is to apply the highest non-*de minimis* rate calculated for a cooperating respondent for the identical program in any segment of the same proceeding. If there is no identical program match within the proceeding, or if the rate is *de minimis*, the second step is to apply the highest non-*de minimis* rate calculated for a cooperating company for a similar program within any segment of the same proceeding. If there is no non-*de minimis* rate calculated for a similar program within [the] same proceeding, the third step is to apply the highest non-*de minimis* rate calculated for an identical or similar program in another countervailing duty proceeding involving the same country. If no such rate exists under the first through third steps, the fourth step is to apply the highest rate calculated for a cooperating company for any program from the same country that the industry subject to the investigation could have used.

Final IDM at 5.

This Court has reviewed with approval Commerce's use of hierarchical methods to determine AFA subsidy rates.[12] *See, e.g.*, *SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1370 (2017) (upholding reasonableness of the hierarchy, stating "Commerce is entitled to devise a methodology to apply to all cases and the court cannot say that

---

[11]     The four-step hierarchy has been developed over time as a practice or policy of Commerce. *See* Final IDM at 5 ("Otherwise, consistent with [19 U.S.C. § 1677e(d)] and our established practice of the hierarchal methodology for selecting an AFA rate in reviews, for certain of the programs . . . we selected as AFA the highest calculated rate for the same or a similar program.").

[12]     Commerce employs a different four-step hierarchy to determine AFA rates in countervailing duty *investigations*, which this Court has reviewed with approval. *See SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1370 (2017).

this methodology is unreasonable in general or as applied here."); *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014).


## DISCUSSION

### I.  Commerce Did Not Err by Using the Hierarchy to Determine an AFA Rate for the Export Buyer's Credit Program

In the Final Results, Commerce determined that using facts available was warranted when determining a subsidy rate for the Export Buyer's Credit Program because China failed to provide requested information about the operation of the program, and thus, necessary information was missing from the record. *See* Final IDM at 27; *see also* 19 U.S.C. § 1677e(a). Additionally, Commerce used an adverse inference because, it found, China had "failed to cooperate to the best of its ability" to comply with the Department's requests for information. *See* Final IDM at 28; *see also* 19 U.S.C. § 1677e(b).

Having determined the use of AFA was warranted, Commerce then applied its hierarchy to select an AFA rate:

> Because we have not calculated a rate for an identical program in this proceeding, we then determine, under step two of the hierarchy, if there is a calculated rate for a similar/comparable program (based on the treatment of the benefit) in the same proceeding, excluding *de minimis* rates. In the instant review, [China] reported that the Export Buyer's Credit Program provides loan support through export buyer's credits. Based on the description of the Export Buyer's Credit Program as provided by [China], we continue to find that Export Seller's Credit Program and the Export Buyer's Credit Program are similar/comparable programs, as both programs provide access to loans. When Commerce selects a similar program, it looks for a program with the same type of benefit. For example, it selects a loan program to establish the rate for another loan program, or it selects a grant program to establish the rate for another grant program. Consistent with this practice, upon examination of the available above *de minimis* programs from the current review and the underlying investigation, Commerce selected the Export Seller's Credit Program because it confers *the same type of benefit* as the Export Buyer's Credit Program, as both programs are subsidized loans from the China Ex-Im Bank.

Final IDM at 31 (emphasis added). Thus, Commerce applied "the 0.87 percent *ad valorem*

countervailable subsidy rate for the Export Seller's Credit Program," which had been previously

determined in an earlier segment of the proceeding, as the AFA rate for the Export Buyer's Credit

Program. Final IDM at 31. Commerce has used this approach in other cases. *See, e.g.*, *Bio-Lab*, 44

CIT at __, 435 F. Supp. 3d at 1378 (sustaining Commerce's selection of the 0.87 percent rate

assigned to the Export Seller's Credit Program during the investigation); *Clearon Corp. v. United

States*, 43 CIT __, 359 F. Supp. 3d 1344, 1361 (2019)[13] (same); *Changzhou I*, 2018 WL 6271653,

at *5.

       Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.54

percent and 1.71 percent, respectively. *See* Final Results, 84 Fed. Reg. at 37,628. To arrive at

Kangtai's rate, Commerce stated that it summed (1) 0.87 percent *ad valorem* for the Export

Buyer's Credit Program; (2) 0.66 percent *ad valorem* for electricity provided at less than adequate

remuneration; and (3) 0.17 percent *ad valorem* for self-reported grants.[14] *See* Final IDM at 6.

Heze's 1.71 percent final net subsidy rate reflects the sum of three countervailable programs:

(1) 0.87 percent *ad valorem* for the Export Buyer's Credit Program; (2) 0.75 percent *ad valorem*

for electricity provided at less than adequate remuneration; and (3) 0.09 percent *ad valorem* for

self-reported grants. *See* Final IDM at 6.

---

[13]    Plaintiffs here were also the plaintiffs in *Clearon*, where they challenged the final
results of Commerce's first administrative review of the Order. Relevant to this case, the *Clearon*
Court sustained the 0.87 percent AFA rate as supported by substantial evidence based on the record
there, and in doing so, rejected many of the same arguments Plaintiffs make here. *Clearon*, 43 CIT
at __, 359 F. Supp. 3d at 1363 (sustaining in part and remanding on grounds not relevant to this
case).

[14]    Although the parties do not dispute Commerce's computation of Kangtai's final net
subsidy rate of 1.54 percent *ad valorem*, it is not clear how the agency arrived at this figure
because, together with the 0.87 percent rate for the Export Buyer's Credit Program, the sum of
these figures equals 1.70 percent.

The domestic-producer Plaintiffs' main argument is that "Commerce's failure to apply an 'adverse' rate pursuant to 19 U.S.C. § 1677e(b) in its final determination was contrary to law":

> The final determination by Commerce resulted in application of a net subsidy rate of only 0.87 percent to the Export Buyer's Credit Program, despite that Commerce had applied a rate of 10.54 percent to that program in prior cases and despite that 0.87 percent was manifestly inadequate to deter China from refusing to supply needed information. The use of adverse facts available is intended to have a deterrent effect and to incentivize participation by foreign governments and parties. The 0.87 percent rate selected by Commerce is inadequate to serve as a deterrent, and defeats the purpose of the statute.

Pls.' Br. 8. In other words, for Plaintiffs, if the 10.54 percent rate, that was selected for the program in a different proceeding, failed to deter non-cooperation by China, a 0.87 percent rate was sure to fail in this proceeding. Although they do not argue for a specific rate, Plaintiffs apparently seek a rate in excess of 10.54 percent since they note that that rate was not sufficient to induce China to cooperate. *See* Pls.' Br. 13.

Plaintiffs acknowledge that "[i]nducement is not the only purpose of the statute," and that Commerce must balance the dual objectives of inducement and accuracy. Pls.' Br. 12. They insist, however, that here, Commerce has ignored the deterrence objective. *See* Pls.' Br. 12 ("Commerce must at least consider whether a particular AFA rate will be effective in encouraging cooperation.").

In response, Commerce insists that its selection of the 0.87 percent rate as AFA was reasonable:

> Commerce applied its long-established practice, codified in 2015, of using its AFA selection methodology specifically for countervailing duty administrative reviews. Applying its review methodology . . ., Commerce selected the rate for the Export Seller's Credit Program calculated for Jiheng during the investigation, as a similar program to the Export Buyer's Credit Program, because they are both loan programs and the rate was above *de minimis*. This methodology serves the dual goals of relevancy and inducement and provides predictability and transparency.

> In addition, considering the facts at hand, Commerce determined that the 0.87 *ad valorem* rate was sufficient to encourage cooperation in the future because it accounts for more than 50 percent of Kangtai's rate. This Court has sustained this same rate—selection of the AFA rate of 0.87 percent based upon Jiheng's calculated rate for the Export Seller's Credit Program from the investigation—in the litigation of the first administrative review. Bio-Lab cites no evidence in the record that would have required Commerce to depart from its established, codified, and judicially-approved administrative review methodology in this administrative review.

Def.'s Br. 7 (citations omitted). Thus, Commerce maintains that its "selection of an AFA rate of 0.87 percent *ad valorem*, based on a calculated rate for a similar program within the same proceeding, is supported by substantial evidence and otherwise in accordance with law." Def.'s Br. 7.

Consistent with this Court's holding in *Bio-Lab I*, the court finds that Commerce did not err by using its hierarchy to determine an AFA rate for the Export Buyer's Credit Program in the Final Results. As observed in *Bio-Lab I*, this Court has rejected arguments similar to those raised by Plaintiffs. In particular, *Changzhou I*, which dealt with similar facts, is instructive.

Before the Court in *Changzhou I* were the final results of an administrative review of a countervailing duty order on solar products. There, as here, Commerce found that China had failed to cooperate to the best of its ability to provide necessary information about the Export Buyer's Credit Program. As a result, Commerce found that the use of AFA was warranted. *See* 19 U.S.C. § 1677e(a), (b). It further found, based on AFA, that the cooperating Chinese respondents had received a benefit under the program, notwithstanding their claims to the contrary. Commerce, thus, applied its hierarchy and, under step two, selected an AFA rate for the program of 0.58 percent—the rate that had been previously determined for another loan program in the same proceeding. *Changzhou I*, 2018 WL 6271653, at *4.

SolarWorld Americas, Inc., the U.S. petitioner, argued that while Commerce was correct to find AFA warranted, its application of the hierarchy to determine the AFA rate for the program was not in accordance with law because the resulting rate—0.58 percent—was too low to achieve the statutory goal of deterrence:

> [I]n using its established [hierarchy] methodology, Commerce arrived at an AFA rate too low to induce compliance in future proceedings. . . . SolarWorld argues that 19 U.S.C. § 1677e requires Commerce to set a rate high enough to encourage a party's future compliance in administrative reviews. . . . SolarWorld details several proceedings in which a higher rate has failed to result in [China's] future full compliance with Commerce's reviews. . . . Based on this history of [China] noncompliance, SolarWorld argues that such a low rate of 0.58 percent will not encourage compliance.

*Id.* (internal citations omitted). The *Changzhou I* Court rejected this argument. Central to its reasoning was that the company that would receive the adverse rate was a cooperating respondent:

> As the United States Court of Appeals for the Federal Circuit has stated "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." . . . What SolarWorld essentially argues is for Commerce to deviate from an established practice because the rate assessed was not high enough to be punitive. This argument fails. . . .
>
> [E]ven if Commerce, on remand, finds that [China] refused to comply with Commerce's requests such that a resort to AFA is warranted, SolarWorld fails to appreciate that [mandatory respondent] Trina is a *cooperating* respondent. When selecting a rate for a cooperating party, "the equities would suggest greater emphasis on accuracy" over deterrence.

*Id.* at *4-5 (first quoting *De Cecco*, 216 F.3d at 1032; then quoting *Mueller*, 753 F.3d at 1234).

The *Changzhou I* Court relied on principles that are well-established in this Court and the Federal Circuit, including that determining a rate that is relevant, *i.e.*, accurate, is a primary statutory objective:

> [A]lthough encouraging compliance is a valid consideration in determining an AFA rate, it is not, as SolarWorld argues "inconsistent with the statute" for Commerce to weigh other factors, such as relevancy, which ultimately result in a presumably

> low AFA rate. . . . As the court in *Mueller* stated, "the primary objective [is] the calculation of an accurate rate."

*Id.* at *5 (quoting *Mueller*, 753 F.3d at 1235); *see also SolarWorld*, 41 CIT at __, 229 F. Supp. 3d at 1366 (citing *De Cecco*, 216 F.3d at 1032) ("An AFA rate selected by Commerce must reasonably balance the objectives of inducing compliance and determining an accurate rate."). The Federal Circuit's opinion in *Mueller*, cited in *Changzhou I*, outlined principles that are applicable here:

> This Court's decision in [*De Cecco*, 216 F.3d at 1032], required that, even for a non-cooperating party, subsection [1677e](b) be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." *All the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix.* Moreover, this Court's decision in *Changzhou* made clear that, *in the case of a cooperating party, Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies.* [*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012)]. And those principles were in no way questioned in [*Fine Furniture*, 748 F.3d at 1370-71], which simply rejected a contention that a countervailing duty rate for a cooperating importer could not be based on adverse inferences drawn against a non-cooperating foreign country (about the country's subsidizing of an input into the importer's product).

*Mueller*, 753 F.3d at 1234 (emphasis added); *see also Changzhou Wujin*, 701 F.3d at 1378 (questioning the relevance of deterrence "where the 'AFA rate' only impacts cooperating respondents" and noting that "applying an adverse rate to cooperating respondents undercuts [with respect to respondents] the cooperation-promoting goal of the AFA statute").

Finally, the *Changzhou I* Court found that the hierarchy was a reasonable way to put into effect the AFA statute. *See Changzhou I*, 2018 WL 6271653, at *5; *see also* 19 U.S.C. § 1677e(d). The Court observed that departing from the hierarchy because the resulting rate was perceived as "too low" could itself be viewed as arbitrary:

> [I]nsisting that Commerce deviate from this established practice because the rate is not seen to be a sufficient deterrent or perhaps, in this circumstance, not sufficiently punitive strikes the court as arbitrary. Commerce's hierarchy establishes both some consistency and predictability in Commerce's determinations and also attempts to

> guard against setting too low a rate by requiring the selected program to have a non-*de minimis* rate. In this specific instance, Commerce applied the *highest* non-*de minimis* rate for a similar program, further supporting its contention that Commerce attempted to strike a balance between relevancy and inducement.

*Changzhou I*, 2018 WL 6271653, at \*5. Ultimately, the Court "sustain[ed] Commerce's use of its established hierarchy in assessing" the 0.58 percent rate for the Export Buyer's Credit Program in that case. *Id.*

As in *Changzhou I*, Plaintiffs would elevate deterrence over accuracy and fairness even though Kangtai and Heze were cooperating respondents. The cases, however, indicate that the respondents' status as cooperating respondents must be taken into account when determining an AFA rate. *See Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1362 ("[W]hether a rate is sufficient to encourage cooperation in the future is based on Commerce's consideration of the facts."). *Clearon* was a case that involved the same plaintiffs and a similar factual record. There too, Commerce used the 0.87 percent rate for the Export Buyer's Credit Program. The plaintiffs argued there, as they do here, that if a 10.54 percent adverse subsidy rate, which was sustained by this Court in a separate case, had failed to deter non-cooperation by China, a 0.87 percent rate, likewise, would probably fail to encourage compliance. The Court rejected the argument that 0.87 percent was "unreasonably low to deter future non-cooperation," and considered the rate's impact on the accuracy of each cooperating respondent's final net subsidy rate. *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1361. For example, noting that Heze's final net subsidy rate, inclusive of the 0.87 percent rate for the Export Buyer's Credit Program, was 1.91 percent, the *Clearon* Court observed that "even if the 0.87 percent rate might appear low in comparison to the 10.54 percent rate, its inclusion in the calculation of Heze's rate increased its rate by approximately 100 percent to 1.91 percent." *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1362.

Although the final net subsidy rates at issue in *Clearon* and those at issue here are different, the same reasoning applies—placing greater emphasis on accuracy over deterrence is not unreasonable when dealing with cooperating respondents. *See Changzhou I*, 2018 WL 6271653, at *5 (quoting *Mueller*, 753 F.3d at 1234) ("When selecting a rate for a *cooperating* party, 'the equities would suggest greater emphasis on accuracy' over deterrence."). Here, Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.54 percent for Kangtai and 1.71 percent for Heze. *See* Final Results, 84 Fed. Reg. at 37,628. Thus, the 0.87 percent AFA rate for the Export Buyer's Credit Program constitutes more than one-half of Kangtai's 1.54 percent rate, and approximately one-half of Heze's 1.71 percent rate. These rates reasonably emphasize accuracy over deterrence without undercutting the cooperation-promoting goal of the AFA statute. *See Changzhou Wujin*, 701 F.3d at 1378. Moreover, if Plaintiffs' argument that a rate of 10.54 percent was too low to result in cooperation were taken seriously, a rate even higher and farther away from an accurately calculated rate would be required. In any event, Plaintiffs' argument is not particularly well-developed. Although they argue for "a higher rate" for the Export Buyer's Credit Program, they propose neither an alternative rate, nor an alternative method to determine one.

Finally, the primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates. *De Cecco*, 216 F.3d at 1032; *see also Mueller*, 753 F.3d at 1235 ("[Commerce's] primary objective [must be] the calculation of an accurate rate."). So long as the AFA rate serves this objective, it is normally found to be within Commerce's sound judgment. *See, e.g.*, *Changzhou I*, 2018 WL 6271653, at *5.

While Plaintiffs would prefer that Commerce depart from its hierarchy and select a higher rate, it was not unreasonable for Commerce to decline to do so. This is especially true because the

situation that resulted in Commerce using AFA was created, not by the failure to cooperate by respondents Kangtai or Heze, but that of China. This distinction matters—Commerce must balance the policies of accuracy and deterrence, or risk potentially undercutting "the cooperation-promoting goal of the AFA statute." *Changzhou Wujin*, 701 F.3d at 1378; *see also Mueller*, 753 F.3d at 1234 (citation omitted) (noting Commerce must consider, on a case-specific basis, "the applicability of deterrence and similar policies"). In other words, the normal purpose of AFA is to induce the respondents themselves to cooperate. Should the respondents find that there is no benefit to their cooperation, they might well conclude that answering Commerce's questionnaires was not worth their while.

Accordingly, the court sustains Commerce's use of its hierarchy in determining an AFA rate for the Export Buyer's Credit Program.

## II.     Commerce's Selection of 0.87 Percent as the AFA Rate for the Export Buyer's Credit Program Is Supported by Substantial Evidence

In the Final Results, Commerce selected an AFA rate for the Export Buyer's Credit Program using its four-step hierarchy. Under step two of the hierarchy, Commerce determined that the Export Buyer's Credit Program and the Export Seller's Credit Program were similar because both conferred a similar benefit—access to government-subsidized loans. Final IDM at 31 ("[U]pon examination of the available above *de minimis* programs from the current review and the underlying investigation, Commerce selected the Export Seller's Credit Program because it confers the same type of benefit as the Export Buyer's Credit Program, as both programs are subsidized loans from the China [Export Import] Bank."). Thus, Commerce used the 0.87 percent *ad valorem* countervailable subsidy rate, which had previously been determined for the Export

Seller's Credit Program in a prior segment of the proceeding, as the AFA rate for the Export

Buyer's Credit Program. *See* Final IDM at 31.

Plaintiffs maintain that the 0.87 percent rate is not supported by substantial evidence

because the record does not support Commerce's finding that the Export Buyer's Credit Program

and the Export Seller's Credit Program are "similar":

> Commerce did not explain its decision that the Export Buyer's Credit was "similar"
> to China's Export Seller's Credit and cited no record evidence to support that
> decision. The *Buyer's* Credits are made to downstream foreign importers or their
> financial institutions and permit payment in U.S. dollars. The *Seller's* Credits are
> made in yuan, paid directly to the Chinese producers or exporters of the
> merchandise. Otherwise, because the Government of China failed to provide
> information requested by Commerce, there was no evidence with which to
> determine whether Export Buyer's and Export Seller's Credits were similar in terms
> and conditions, amount of the credits, interest rates, duration, or any other
> measurable criteria. As such, the determination that these credits were similar was
> not based on substantial evidence.

Pls.' Br. 4. Put another way, for Plaintiffs, "similarity" requires more than a finding that the two

programs are government-subsidized loan programs. They contend that Commerce has not

demonstrated that seller's credits are an "adverse proxy" for buyer's credits. Pls.' Reply 2

("Commerce . . . failed to provide any reasonable basis for selecting the Export Seller's Credit as

an 'adverse' proxy for the Export Buyer's Credit.").

Based on the record, the court finds that Commerce has supported with substantial

evidence, and adequately explained, its similarity finding. *See Bio-Lab*, 44 CIT at __, 435 F. Supp.

3d at 1375 (sustaining "similarity" finding on a similar record); *Clearon*, 43 CIT at __, 359 F.

Supp. 3d at 1362 (same). Here, Commerce found, using information provided by China, that the

Export Seller's Credit Program "confers the same type of benefit as the Export Buyer's Credit

Program, as both programs are subsidized loans from the China [Export Import] Bank." Final IDM

at 31. There is no dispute that the record shows that both programs provide loans at preferential rates from China through the China Export Import Bank to support Chinese exports.

This Court has upheld Commerce's finding that the Export Buyer's Credit Program is "similar" to other programs that confer subsidized loans. In *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, 352 F. Supp. 3d 1316 (2018) ("*Changzhou II*"), the Court reviewed Commerce's finding that the Export Buyer's Credit Program and a preferential lending program aimed at the renewable energy industry (the "Lending Program") were similar because both provided access to loans at preferential rates. *Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1328 (noting that "Commerce predicated [its] finding of similarity on both the [Export Buyer's Credit Program's] and the [Lending] Program's distribution of loans."). The Court reached its decision even though the plaintiffs argued that the program at issue here, the Export Seller's Credit Program, was more similar to the Export Buyer's Credit Program than the Lending Program. In other words, the plaintiffs in *Changzhou II* argued that Commerce erred by failing to examine whether the Export Seller's Credit Program or the Lending Program was "more similar" to the Export Buyer's Credit Program. Relying on the plain language of the statute, the Court rejected this argument: "Under Commerce's established [hierarchy] methodology and consistent with the plain text of the statute, Commerce selects a *similar* program, not necessarily the *most similar* program." *Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1329 (citing 19 U.S.C. § 1677e(d)(1)(A)(i)).

The *Changzhou II* holding applies equally here. To apply step two of its hierarchy, Commerce must select a program that is similar to the one with respect to which information is missing from the record. To make this selection, Commerce is not required to compare multiple

programs to determine which is the "most similar" to the program. *Id.*, 42 CIT at __, 352 F. Supp.

3d at 1328-29. Selecting a program that is similar is enough to satisfy the statute.

The plaintiffs in *Changzhou II* also argued, as Plaintiffs do here, that Commerce had failed

to explain adequately its rationale underlying its similarity finding. As summarized by the Court,

Commerce stated how it arrived at its similarity finding:

> After finding no program identical to the [Export Buyer's Credit Program] in the
> same administrative review, Commerce identified a similar program in the same
> proceeding to use as a basis for calculating the rate for the [Export Buyer's Credit
> Program]. . . . Commerce calculated a rate of 5.46 percent *ad valorem*, for the
> [program] by utilizing the rate "calculated for company respondent Lightway Green
> New Energy Co., Ltd.'s usage of the [Lending Program] in the 2012 administrative
> review of this proceeding." . . . Commerce explained that the [Lending Program] .
> . . was similar because both it and the Export Buyer's Credit Program provided
> access to loans.

*Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1327 (record citations omitted). The Court found

that Commerce was not required to provide a more detailed explanation of its similarity finding,

and that substantial evidence supported its decision: "Although a more detailed description [of

why the Export Buyer's Credit Program and the Lending Program were "similar"] might be

helpful, it is not required." *Id.*, 42 CIT at __, 352 F. Supp. 3d at 1329.

This Court also found adequate Commerce's explanation of its similarity finding in

*Solarworld Americas, Inc. v. United States*, 40 CIT __, 182 F. Supp. 3d 1372 (2016), which again

involved the Export Buyer's Credit Program and the Lending Program. There, the parties disagreed

as to whether Commerce had adequately explained its similarity finding. As summarized by the

Court, Commerce stated the basis for its finding:

> [N]oting that it lacked a calculated rate for the Export Buyer's Credit Program from
> another responding company, Commerce applied the second level of its AFA rate
> selection hierarchy for administrative reviews. . . . Thus, it selected the rate
> calculated for the [Lending Program] in this same administrative review to the
> Export Buyer's Credit Program after determining that the two programs were
> similar. . . . Commerce supported its determination that the programs were similar,

noting that both programs call for financial institutions to provide *loans at preferential rates*.

*SolarWorld Americas*, 40 CIT at __, 182 F. Supp. 3d at 1377-78 (emphasis added) (record citations omitted). The Court found that "Commerce's logic in considering the programs similar [was] reasonably discernible because both loan programs perform similar functions in support of Chinese industry by offering lower interest rates on loans than would otherwise be available to these companies." *Id.*, 40 CIT at __, 182 F. Supp. 3d at 1377-78 n.8. Considering the similar purposes of the programs it is fair to presume that the subsidy provided would be about the same and that the benefit conferred by each program would be about the same.

    As in *Changzhou II* and *SolarWorld*, Commerce's rationale for finding that the Export Buyer's Credit Program and the Export Seller's Credit Program were similar is reasonably discernible. Plaintiffs point to the dearth of information on the record regarding the specific terms and conditions of the two programs, insisting that Commerce could not reasonably have compared them. While programmatic details might be useful, in this case what is needed is a way to find the size of the benefit that the respondents could reasonably be said to have received, so that a percentage can be added to the amount of the countervailing duty. Thus, the details of the program are less important than the magnitude of the benefit conferred. *See* Final IDM at 31 ("Commerce selected the Export Seller's Credit Program because it confers the same type of benefit as the Export Buyer's Credit Program, as both programs are subsidized loans from the China Ex-Im Bank."); *see also Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1347 (discussing both programs).

    As their names indicate, each program's purpose is to support Chinese industry by promoting exports. *See* Heze's Sec. III Quest. Resp. – Part II, Ex. 11 at Art. 2 (Rules Governing Export Buyers' Credit, dated Nov. 20, 2000) (English trans.) ("The Export Buyer's Credit refers to the medium and long-term credit offered by the [China Export Import] Bank to creditworthy

foreign borrowers to support the export of Chinese capital goods, services."); *Chlorinated Isocyanurates From the People's Rep. of China*, 79 Fed. Reg. 10,097 (Dep't Commerce Feb. 24, 2014), and accompanying Preliminary Decision Mem. (Feb. 11, 2014), subsec. XII.A.3 ("The purpose of [the Export Seller's Credit Program] provided by [the China Export Import Bank] is to support the export of [Chinese] products and improve their competitiveness in the international market. The export seller's credit [i]s a loan with a large amount, long maturity, and preferential interest rate."). Given their common purpose, it is not unreasonable to conclude that the interest rate charged for the loans would be about the same. That is, each is a program initiated by China to provide below-market-rate loans to benefit Chinese producers. While additional information, had it been provided by China, may have allowed Commerce to make a more detailed comparison of the two programs, Commerce's conclusions regarding the rate of subsidization (and hence the benefit conferred) are adequately supported by the record. *See Bio-Lab*, 44 CIT at __, 435 F. Supp. 3d at 1378 (upholding the 0.87 percent rate as supported by substantial evidence); *Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1360-61 (same).

Accordingly, Commerce's selection of 0.87 percent as the AFA rate for the Export Buyer's Credit Program is sustained.

## CONCLUSION

Based on the foregoing, Commerce's use of its hierarchy and the resulting 0.87 percent rate for the Export Buyer's Credit Program are supported by substantial evidence and otherwise in accordance with law. Judgment shall be entered accordingly.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated:          December 18, 2020
                New York, New York